UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------- X
                                     :

SCOTT WRIGHT,                    :

                  Plaintiff,     :

                                       :

            -v-                       :          14-cv-8976 (KBF)

                                       :

JACQUELINE MUSANTI,            :         OPINION & ORDER

                                       :

                  Defendant.    :

                                       :

------------------------------------------------------------- X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: January 20, 2017

KATHERINE B. FORREST, District Judge:

       This dispute arises from a physical altercation that took place between two individuals, previously unknown to one another, walking to work one morning near Penn Station.  Jacqueline Musanti, the defendant in this action, believed Scott Wright, the plaintiff, intentionally cut in front of her on the sidewalk.  She kicked him and things went downhill from there.  Plaintiff ended up under arrest and in a holding cell.  Shortly after the incident, he commenced this action for assault, battery and false arrest.  On October 6, 2016, the Court held a one-day bench trial at which plaintiff and defendant testified, defendant appearing pro se.[1]  At the conclusion of the trial, the parties presented brief closing arguments.  This Opinion & Order constitutes the Court's findings of fact and conclusions of law.  See Fed. R. Civ. P. 52.  As set forth below, this Court finds that plaintiff is entitled to judgment

---

[1] Defendant provided direct testimony in narrative form in lieu of the typical question and answer format.  To facilitate defendant's testimony and cross-examination of plaintiff, the Court provided a summary of relevant legal principles developed by the Court, with input by the parties.  (See ECF No. 80.)

on each of his claims.  The Court imposes an award of compensatory and punitive damages.

I.     PROCEDURAL HISTORY

On November 12, 2014, plaintiff Scott Wright, a slight African American man, brought this action against New York Police Department Officer Michael Manetta and Jacqueline Musanti, a medium-sized Caucasian woman, asserting one claim under 42 U.S.C. § 1983 ("Section 1983") against Officer Manetta and three claims under New York tort law against Musanti.  (ECF No. 2.)  Plaintiff's allegations flow from an altercation with Musanti and plaintiff's ensuing arrest by Officer Manetta.

On February 5, 2016, the Court dismissed plaintiff's Section 1983 claim, see Wright v. NYPD Officer Manetta et al., No. 14-cv-8976 (KBF), at *5 (S.D.N.Y. Feb. 5, 2016), leaving Musanti as the only defendant (hereinafter "defendant").  Despite having dismissed the sole federal claim, the Court retained jurisdiction on the basis of diversity.  (ECF No. 26; see also ECF No. 31 (denying reconsideration).)

As to defendant, plaintiff claimed:  (1) assault and battery (ECF No. 2 ¶¶ 52-58);[2] (2) false arrest (id. ¶¶ 59-66); and (3) malicious prosecution (id. ¶¶ 67-74).  Defendant answered on March 13, 2015, asserting, inter alia, defenses of self-defense (to plaintiff's assault and battery claims) (ECF No. 9 ¶ 79) and probable

---

[2] As assault and battery are distinct torts with differing elements, throughout this Opinion & Order, the Court refers to assault and battery as separate claims alleged by plaintiff, notwithstanding the styling of the complaint.

cause (to plaintiff's false arrest claim) (<u>id.</u> ¶ 83).[3]  Defendant did not counterclaim against plaintiff.  (<u>Id.</u>)  On September 14, 2016, the Court granted summary judgment dismissing plaintiff's malicious prosecution claim.  (ECF No. 71.)

Throughout the litigation, defendant appeared <u>pro se</u>.  At various times, and based on specific application to this Court, defendant engaged the assistance of a <u>per diem</u> attorney to assist with filings and depositions.  (<u>See, e.g.</u>, ECF Nos. 39, 77.)  As the case neared trial and it became clear that defendant did not lack resources, the Court encouraged defendant to retain the <u>per diem</u> attorney or other counsel to represent her at trial.  (ECF No. 77.)  Defendant chose not to do so and appeared at trial <u>pro se</u>.

On October 6, 2016, this Court held a one-day bench trial on the remaining claims and defenses.  As stated above, this Opinion & Order constitutes the Court's findings of fact and conclusions of law.  <u>See</u> Fed. R. Civ. P. 52.

II.    FINDINGS OF FACT[4]

The evidence in this case reflects a "he said, she said" dispute with a twist. The twist is a twenty-six second, silent surveillance videotape obtained from a building on 39th Street.  (PX 1.)[5]  This videotape captures the initial portion of the

---

[3] Defendant asserted twelve defenses in total, of which only the above two are relevant here.  The remaining defenses relate to, <u>inter alia</u>, statutes of limitations, service of process and conditions precedents to bringing suit.  None of these defenses have any basis in the factual record.

[4] The Court's findings of fact are based on determinations by a preponderance of the credible evidence.  <u>See</u> <u>Scientific Components Corp. v. Sirenza Microdevices, Inc.</u>, 399 F. App'x 637, 638 (2d Cir. 2010).  The Court has also considered evidentiary objections lodged by the parties.  With regard to any objections to evidence cited in this Opinion not individually addressed, the Court finds that they are without merit.

[5] The notation "PX" refers to trial exhibits proffered by plaintiff and received in evidence.

parties' encounter, thereby injecting a degree of objective truth into what is otherwise a credibility contest between plaintiff and defendant. Making a judgment about whose story to believe did not present a close call: plaintiff was in all respects credible and the Court credits plaintiff's version of events. Plaintiff's testimony was consistent and his demeanor was measured and calm. By contrast, defendant lacked credibility. This determination is based on the objective evidence on the videotape and her demeanor and lack of consistency. First, the surveillance videotape directly refutes defendant's depiction of plaintiff as the initial aggressor, instead demonstrating that defendant initiated the altercation. This discrepancy casts immediate doubt on defendant's testimony that plaintiff continued acting as the aggressor off-camera. Second, plaintiff's counsel used defendant's deposition testimony to repeatedly impeach her on cross-examination. Third, in contrast to plaintiff's demeanor, defendant appeared excitable, impulsive and defensive as she told her story.

A.    The Physical Altercation

Plaintiff is a slightly built African American male who resides in Queens, New York. (See Tr. 10:5-9, 24:5-11, 46:23-24.)[6] At the time of the incident, he was employed as an account manager at Webgains, an online marketing company. (Id. 11:2-15.) He is currently employed as a human resource analyst at Marsh & McLennan. (Id. 10:15-20.) Defendant is a Caucasian female who previously worked at an apparel company located in New York City but now lives in Nashville,

---

[6] The notation "Tr." refers to the trial transcript, dated October 6, 2016.

4

Tennessee.  (See id. 80:10-19.)  Defendant currently works on a freelance basis in the fashion industry.  (Id.)

On November 21, 2013—the date of the subject incident—plaintiff and defendant worked in neighboring office buildings on 39th Street between 7th and 8th Avenues.  (See id. 11:2-10, 80:10-13.)  Prior to November 21, 2013, plaintiff and defendant had never met.  (Id. 12:13-14, 52:22-53:3.)  They first encountered one another that morning during rush hour—at around 9:00 a.m.—while walking to work on 39th Street. (Id. 11:2-10, 11:19-21, 12:19-13:4, 52:22-53:3, 68:19-23.)  The sidewalk was crowded.

The surveillance videotape depicts the parties walking in the same direction in the middle of the sidewalk amidst numerous pedestrians.  (PX 1 at 1".)  Defendant was initially walking a few paces diagonally behind plaintiff's right side.  (Id.)  Defendant then crossed in front of plaintiff and continued walking diagonally in front of his left side.  (Id. at 1-2".)  After a few more steps, plaintiff passed in front of defendant on her right side and continued walking directly in front of her, leaving a very short distance—no more than a few feet—between them.  (Id. at 2-11"; see also Tr. 87:2-11.)

Defendant's central assertion is that "plaintiff started it" by bumping into her, cutting across her path and cutting her off.  (See Tr. 70:2-17 (stating that plaintiff "bumped" her as she was walking, and "words were exchanged."); see also id. 86:11-23.)  The videotape is unclear as to whether plaintiff contacted defendant as he passed her.  (See PX 1 at 7-8".)  However, based on plaintiff's overall

demeanor and presentation at trial, the Court credits his testimony that he did not contact or say anything to plaintiff when he passed her.  (See Tr. 14:7-9, 14:13-14; see also id. 55:14-17, 55:23-56:1.)  Further, while plaintiff cut very closely in front of defendant and evidently obstructed her path, the Court likewise credits plaintiff's testimony that he did not cut her off intentionally.  (See id. 14:10-12 ("Q:  When you walked past Ms. Musanti on the sidewalk, did you try to trip her, get in her way, interfere with her in any way?  A:  No.  Honestly, I'm simply just walking to work; so. . . .").)

Immediately after plaintiff passed defendant, defendant stepped on plaintiff's heel and stumbled.  (PX 1 at 11-12"; Tr. 12:19-13:4, 87:19-25, 88:18-89:4.)  After regaining her balance, defendant intentionally kicked plaintiff's calves as he continued walking down the sidewalk.[7]  (PX 1 at 12-13"; Tr. 12:19-13:4, 13:17-19, 91:19-22; see also id. 115:17-19.)  The parties then walked beyond the videotape's visible frame.  (PX 1 at 12-13".)

The remainder of the alleged altercation is not captured on videotape.  The most we see is the reaction of a bystander, who, at the end of the videotape, momentarily stopped walking to view something ahead.  (Id. at 15-18".)  In the absence of further footage—and given that the sole testimony was from the parties themselves—there is some uncertainty regarding what occurred next.

---

[7]At her deposition, defendant testified that she "kicked at [plaintiff] because he rudely and purposefully cut in front of her".  (Tr. 91:2-6.)  At trial, defendant denied that she was "trying to kick him", stating instead that, through a "sideswipe motion", she sought to signal "get away, you just tripped me, you just bumped me, like, back away from me."  (Id. 71:7-12; see also id. 89:5-8; 91:13-18.)

Nevertheless, the parties' accounts overlap to a degree, permitting the Court to make the following findings.

First, shortly after defendant intentionally kicked plaintiff, plaintiff turned around and verbally confronted her, prompting a heated exchange. (Tr. 12:19-13:16, 14:15-22, 72:8-15, 97:16-25.) Plaintiff asked—in an emphatic tone of voice— "Did you really just kick me?" (Id. 12:19-13:16; see also id. 72:8-25 (recalling statement as, "[W]hat did you just do and why did you just do that?").) Defendant responded to the effect of, "I f-ing kicked you, and I'll do it again, you know." (Id. 14:15-22; see also id. 12:19-13:4.) During this verbal exchange, defendant raised a bent leg in front of her person and "kicked out at [plaintiff] to push him away from [her] face". (Id. 96:1-6; see also id. 72:8-73:7, 95:14-17, 96:9-12.) Plaintiff did not respond to this remark or physical gesture.[8] (Id. 17:6-14; 59:19-24.) Instead, he turned around and walked towards the front door of his office building, which at that point was five-six feet away. (Id. 14:15-16:3.) As plaintiff walked away, defendant continued making statements to the effect of, "I'm going to f-ing kick you again" and positioned herself in front of plaintiff to block his entry into his office building (id. 15:15-16:3).

Plaintiff then tried to move defendant out of the way. (Id. 15:15-16:18, 57:15-17.) In response, defendant turned around and went "ballistic"—hitting,

---

[8] Defendant testified that, in the course of the verbal exchange, plaintiff's finger touched her face, and that she was unsure whether plaintiff "meant to hit [her] eye or nose or any part of [her]". (Id. 71:7-17; see also id. 72:8-72:25, 96:21-97:5.) The Court does not credit this testimony. Instead, the Court credits plaintiff's testimony that he did not have any physical contact with defendant during this exchange. (See id. 17:6-14.)

kicking and scratching plaintiff and trapping him against his building's façade.  (Id. 24:12-25:16, 57:18-21; see also id. 73:8-75:5 (admitting that defendant "turned around, and [] started yelling at [plaintiff]" and "put [her] leg up in defense mode"); id. 99:14-22 (admitting that defendant had her hands up and used her feet to "push[] him away from [her]").)  Plaintiff then grabbed defendant's coat collar and pulled her to the ground in an attempt to "neutralize" her.  (Id. 24:12-25:16; see also id. 27:14-24, 57:22-58:1, 73:8-75:13.)  A security guard from plaintiff's office (who plaintiff knew personally) approached plaintiff from behind and immobilized him in a "bear hug".  (Id. 24:12-25:16, 58:23-59:1.)  Plaintiff placed his hands up and stated, "I do not want to fight", to which the guard responded, "I know." [9]  (Id. 25:21-26:3; see also id. 29:5-15.)  The guard released defendant soon thereafter.  (Id. 29:5-15.)

By this time, a crowd had assembled.  (Id. 29:5-30:3, 75:6-23, 77:8-20.)  When the security guard released plaintiff, defendant again attempted to physically block him from entering his office building.  (Id. 29:5-30:3, 101:20-103:9; see also id. 119:24-120:5.)  Following a brief altercation near the doorway, plaintiff entered his office building and took the elevator up to his floor.  (Id. 101:9-103:9; see also id. 29:5-30:3, 59:13-18, 73:8-75:5.)  From that point onward, plaintiff had no further direct interactions with defendant.  (Id. 30:4-6.)

---

[9] The Court found these hearsay statements admissible for the truth of the matter asserted (as an excited utterance by plaintiff) and for the purpose of demonstrating plaintiff's state of mind.  (Id. 25:21-26:17.)

B.     The Arrest

Although neither plaintiff nor defendant called the police to report the incident (id. 59:25-60:4, 77:21-22, 106:11-13), the police arrived on the scene shortly after plaintiff went into his office building (id. 77:13-20 (recalling that police arrived "a couple of seconds" later)).  Soon thereafter, defendant, some witnesses and a few of her work colleagues gathered in the lobby of plaintiff's building (id. 78:8-23), and the police questioned those present about the altercation (id. 77:21-78:23, 106:11-18; see also 107:15-19).  Defendant did not ask the other witnesses to speak with the police on her behalf (id. 113:16-21) and did not overhear any of their conversations (id. 108:2-4).  In addition, plaintiff did not witness defendant or other individuals speaking with the police.  (Id. 60:5-10.)

Defendant told the police the same account to which she testified in Court. (Id. 77:21-78:3, 113:24-114:2; see also id. 114:16-115:2.)  Specifically, defendant told the police, inter alia, that plaintiff purposefully cut her off on the street in order to trip her (id. 115:3-10), and that she kicked plaintiff in his calf (id. 115:17-20, 117:16-19) because she felt personally under attack (id. 116:6-9).  Defendant did not tell the police that she was responsible for the altercation (id. 117:1-3) or that the altercation stemmed from a misunderstanding with plaintiff that spiraled out of control (id. 117:4-8).

Meanwhile, about a minute after plaintiff reached his office, around seven to nine police officers came up to his floor.  (id. 30:23-31:2; see also id. 60:11-13.)  The officers approached plaintiff at his desk, informed him that he was under arrest and

9

immediately placed him in handcuffs.  (Id. 31:3-22.)  One of plaintiff's colleagues witnessed the arrest.  (Id. 31:23-32:7.)  Although plaintiff repeatedly requested to press charges against defendant, the police told him he could not do so.  (Id. 31:3-22, 33:6-23.)  All told, the police were in plaintiff's office for about ten to fifteen minutes.  (Id. 32:16-18.)  The officers then rode the elevator down with plaintiff (id. 33:24-34:6) and escorted him through the lobby, then crowded with individuals (id. 34:7-15).

The police ushered plaintiff into a patrol car parked outside, where he remained for roughly 45 minutes.  (Id. 34:16-35:3.)  During this time, a number of people walked by, some of whom took photographs of him in the back of the vehicle. (Id.)  In addition, while plaintiff was in the patrol car, the police officers asked defendant "what [she] wanted to do"—that is, whether she wanted to press charges. (Id. 118:8-119:2, 119:5-10.)  She informed them that she did.  (Id. 119:3-4; see also id. 119:24-120:25.)

The police then drove plaintiff to a nearby precinct, where he spent about forty minutes in a small cell.[10]  (Id. 35:13-37:4.)  After about an hour at the precinct, plaintiff was issued a desk appearance ticket to appear in New York City Criminal Court on January 6, 2014 and was released.  (Id. 37:5-15, 38:18-39:2; PX 2.) Plaintiff then returned to work.  (Tr. 62:2-4.)  He did not seek medical treatment (id. 62:5-10), as his only physical injuries were a few minor scratches on his face (id.

---

[10] Plaintiff had never before been held at a police precinct.  (Id. 50:14-51:4.)

30:7-12, 62:11-13; <u>see also</u> <u>id.</u> 57:7-8.)  In total, approximately two hours passed from plaintiff's initial handcuffing to his release from the precinct.  (<u>Id.</u> 41:23-42:3.)

Plaintiff was arraigned on January 6, 2014 (<u>id.</u> 38:18-39:6), at which point he learned he had been charged with two counts of assault in the third degree, one count of attempt and one count of harassment in the second degree.  (<u>Id.</u> 38:25-39:11; PX 4.)  Plaintiff appeared in criminal court four or five times throughout 2014 to address these charges.  (Tr. 44:1-4; <u>see also</u> <u>id.</u> 39:12-15.)  They were ultimately dismissed on October 2, 2014.  (<u>Id.</u> 42:7-8, 43:19-25, 44:5-8; PX 4.)

Plaintiff's only out-of-pocket expenses stemming from the altercation were his legal and investigative fees in the criminal matter.[11]  (<u>Id.</u> 39:16-41:6.)  In this regard, plaintiff paid a flat fee of $5,000 to engage a criminal defense attorney (<u>id.</u> 39:16-40:4) and an additional $300 to $400 for a private investigator recommended by his defense attorney (<u>id.</u> 40:20-41:1).

Plaintiff testified consistently and credibly that he felt embarrassed and humiliated by the altercation and ensuing arrest.  (<u>Id.</u> 34:7-15, 34:19-35:3, 45:15-46:4, 45:15-46:4.)  For instance, when asked how these events affected him personally, plaintiff testified:

> [U]ltimately, I felt embarrassed.  I felt humiliated.  I'm the one who is being attacked on the street.  I'm the one who was being arrested in front of my coworkers.  I'm the one who is being dragged through the lobby by seven to nine police officers, you know, in front of like my colleagues, in front of my clients and everything.  So that's humiliating.  I don't want that.  It's embarrassing.  Me sitting in the patrol car, having people take pictures of me like I'm a showpiece or something like that, that's embarrassing.

---

[11] Plaintiff did not lose any compensation as a result of missing work for court appearances.  (<u>Id.</u> 41:15-19.)

(<u>Id.</u> 45:15-46:4.)

III.    CONCLUSIONS OF LAW

As discussed below, the Court concludes that defendant assaulted and battered plaintiff (without acting in self-defense) and falsely arrested plaintiff.

A.    <u>Assault</u>

Under New York law, "'[a]n 'assault' is an intentional placing of another person in fear of imminent or offensive contact.'" <u>Girden v. Sandals Int'l</u>, 262 F.3d 195, 203 (2d Cir. 2001) (quoting <u>United Nat'l Ins. Co. v. Waterfront N.Y. Realty Corp.</u>, 994 F.2d 105, 108 (2d Cir. 1993)); <u>Farash v. Cont'l Airlines, Inc.</u>, 337 F. App'x 7, 9-10 (2d Cir. 2009) (same).  "The plaintiff must show that the defendant intended 'either to inflict personal injury or to arouse apprehension of harmful or offensive bodily contact.'" <u>Bouveng v. NYG Capital LLC</u>, No. 14-cv-5474 (PGG), 2015 WL 3503947, at *9 (S.D.N.Y. June 2, 2015) (quoting Wahlstrom <u>v. Metro-N. Commuter R. Co.</u>, 89 F. Supp. 2d 506, 528 (S.D.N.Y. 2000)).  Although a plaintiff "need not prove actual contact, she must allege some physical menace against her body."  <u>Id.</u> (quoting <u>Wahlstrom</u>, 89 F. Supp. 2d at 528) (alteration omitted).  That is, "there must be proof of physical conduct placing plaintiff in imminent apprehension of harmful contact."  <u>Holtz v. Wildenstein & Co., Inc.</u>, 693 N.Y.S.2d 516, 517 (1st Dep't 1999) (citing <u>Hassan v. Marriott Corp.</u>, 663 N.Y.S.2d 558, 559 (1st Dep't 1997)); <u>see also Cotter v. Summit Sec. Servs.</u>, 788 N.Y.S.2d 153, 154 (2d Dep't 2005) (citation omitted).  "[A]ctions that are discourteous but that do not create apprehension of imminent harmful or offensive contact do not constitute an assault."  <u>Wahlstrom</u>, 89

12

F. Supp. 2d at 528 (citing, <u>inter alia</u>, <u>Hayes v. Schultz</u>, 541 N.Y.S.2d 115, 116 (2d Dep't 1989)).

Here, defendant assaulted plaintiff numerous times during the course of their altercation. All of these assaults occurred off-camera.[12] The first occurred shortly after plaintiff's initial kick, when defendant turned around and verbally confronted plaintiff. (<u>See</u> Tr. 12:19-13:16, 14:15-22, 72:8-15, 97:16-25.) At that point, plaintiff stated, "I f-ing kicked you, and I'll do it again, you know", raised her leg and "kicked out" towards plaintiff. (<u>Id.</u> 96:1-6; <u>see also</u> <u>id.</u> 72:8-73:7, 95:14-17, 96:9-12.) This constitutes classic assault. Through these threatening gestures and words, defendant obviously intended to make plaintiff fear that she would imminently kick him, and plaintiff was placed in imminent apprehension of harmful contact. <u>See</u> <u>Wahlstrom</u>, 89 F. Supp. 2d at 528; <u>Bouveng</u>, 2015 WL 3503947, at *9. The same is true of defendant's later attempts to physically block defendant from entering his office building while stating, "I'm going to f-ing kick you again." (Tr. 15:15-16:3.) As plaintiff had, by now, been kicked once by defendant, plaintiff's apprehension of imminent contact was more than reasonable. As before, here defendant assaulted plaintiff by employing expletives and physical maneuvering to make defendant fear for his physical safety. For the same reasons, defendant also assaulted plaintiff when she hit, kick and scratched plaintiff and trapped him against the building's façade (<u>id.</u> 24:12-25:16, 57:18-21; <u>see also</u> <u>id.</u> 73:8-75:5, 99:14-22), and later

---

[12] Defendant's initial kick (captured on video) does not constitute an assault (but as discussed, does constitute a battery) because plaintiff was then walking in front of defendant. There is no evidence that plaintiff understood the imminence of the kick/offensive touching, and therefore plaintiff could not have apprehended imminent physical contact. <u>See</u> <u>Girden</u>, 262 F.3d at 203 (stating that assault requires that victim experience "fear of imminent harmful or offensive contact.").

attempted to physically block him from entering his office building at the conclusion of the altercation (id. 29:5-30:3, 101:20-103:9; see also id. 119:24-120:5).

B.    Battery

Under New York law, "'[a] 'battery' is an intentional wrongful physical contact with another person without consent.'" Girden, 262 F.3d at 203 (quoting United Nat'l Ins. Co., 994 F.2d at 108).  To establish a battery, a plaintiff must prove that (1) the defendant made bodily contact, (2) the contact was harmful or offensive, (3) the defendant intended the contact, and (4) the plaintiff did not consent to the contact.  Naughright v. Weiss, 826 F. Supp. 2d 676, 685 (S.D.N.Y. 2011) (citing Siegell v. Herricks Union Free Sch. Dist., 777 N.Y.S.2d 148, 151 (2d Dep't 2004)); see also Higgins v. Hamilton, 794 N.Y.S.2d 421, 422 (2d Dep't 2005) (citations omitted).  "The intent required for battery is intent to cause a bodily contact that a reasonable person would find offensive."  Cerilli v. Kezis, 790 N.Y.S.2d 714, 715 (2d Dep't 2005) (internal quotation marks and citation omitted). Any alleged injury to plaintiff "may be unintended, accidental or unforeseen." Hughes v. Farrey, 817 N.Y.S.2d 25, 28 (2d Dep't 2006).

Here, as with assault, defendant repeatedly battered defendant during the course of the altercation.  The first battery occurred when defendant initially kicked plaintiff from behind.  There is no doubt that the defendant made physical contact (defendant's kick contacted plaintiff's calves), and that this contact was objectively harmful and offensive and not consented to by plaintiff.  (See PX 1 at 12-13"; Tr. 12:19-13:4, 13:17-19, 91:19-22; see also id. 115:17-19.)  See also Naughright, 826 F.

14

Supp. 2d at 685.  As for intent, defendant conceded that the kick was purposeful, and that is enough.  (See Tr. 91:2-6 (defendant admitted she "kicked at [plaintiff] because he rudely and purposefully cut in front of her") (quoting deposition testimony).)[13]  For the same reasons, the hitting, scratching, kicking and other contact that occurred at the office building's façade right after plaintiff "pushed" defendant (id. 24:12-25:16, 57:18-21, see also id. 73:8-75:5, 99:14-22), and again at the entryway following plaintiff's release from the "bear hug", constituted actionable batteries (id. 29:5-30:3; 101:20-103:9; see also id. 119:24-120:5).

A.   Self-Defense

Self-defense is an affirmative defense to assault and battery.  To prove an assault or battery was undertaken in self-defense, a defendant must establish that (1) she is not the initial aggressor, (2) she reasonably believed that the plaintiff was attacking or about to attack him, and (3) the force used to defend herself was reasonable under the circumstances.  Sachs v. Musa, No. 10-cv-1663 (JPO), 2014 WL 1855615, at *2 (S.D.N.Y. May 8, 2014), aff'd sub nom. Sachs v. Cantwell, __ F. App'x __, No. 14-1985, 2016 WL 3410210 (2d Cir. June 17, 2016) (citing Killon v. Parrotta, 950 N.Y.S.2d 525, 526 (3d Dep't 2012) and Restatement (Second) of Torts §§ 63, 67, 76); see also Biggs v. City of N.Y., No. 08-cv-8123 (PGG), 2010 WL 4628360, at *8 (S.D.N.Y. Nov. 16, 2010) (requiring proof "that the person attacked

---

[13] While defendant denied at trial that she was "trying to kick [plaintiff]", this statement is belied by her deposition testimony, which the Court finds more credible on this point.  In addition, the Court finds defendant's testimony at trial that she intended to kick plaintiff in order to signal for him to "get away" is consistent with its finding that defendant intended to contact plaintiff in executing the kick.

was under a danger or apparent danger of death or of great bodily harm") (citation omitted). "The use of self-defense is 'subject to the fundamental limitation that in protecting oneself no more force is permissible than will reasonably effect such protection.'" Biggs, 2010 WL 4628360, at *8 (quoting Merzon v. Cnty. of Suffolk, 767 F. Supp. 432, 448 (E.D.N.Y. 1991)).

Here, the Court concludes that defendant did not commit any of the above-described assaults and batteries in self-defense. Instead of analyzing each assault and battery separately, the Court proceeds by assessing the totality of the conduct under each of the three elements. See Sachs, 2014 WL 1855615, at *2 (setting forth elements of self-defense).

### 1.   Initial Aggressor

First, at all relevant times during the parties' encounter, defendant was plainly the initial aggressor. This in itself defeats defendant's assertion that she acted in self-defense. See Sachs, 2014 WL 1855615, at *2.

As described above, before defendant kicked plaintiff (the first battery), plaintiff's sole conduct towards defendant was to pass her on the street twice, one time quite closely, causing defendant to trip on plaintiff's heel. (See PX 1 at 1-11"; Tr. 87:2-18.) Plaintiff did not speak to or contact defendant when he passed her. (Tr. 14:7-9, 14:13-14; see also id. 55:14-17, 55:23-56:1.) Nor did he intentionally cut her off. (Id. 14:10-12.) Under these circumstances, defendant's kick clearly altered the tenor of the parties' interaction, shifting the encounter from an ordinary, non-aggressive interaction between two pedestrians to something more akin to a street

16

brawl.  As a result, defendant served as the initial aggressor at the outset of the

encounter, rendering her liable to plaintiff for all ensuing assaults and batteries.

Cf. People v. Grady, 838 N.Y.S.2d 207, 212 (3d Dep't 2007) (concluding that

defendant was "initial aggressor" for duration of encounter because he "escalated a

routine arrest into a violent confrontation.")

Embedded in this conclusion is the assumption that all of the parties'

interactions—from when the parties first passed one another on the street until

when plaintiff entered his office building—constitute one "encounter" for purposes

of assessing who was the initial aggressor.  Given the short timeframe of the

altercation, this assumption is sound.  Nevertheless, the Court's conclusion that

plaintiff served as the initial aggressor remains unchanged even if the Court spliced

the parties' overall interaction into a series of many distinct encounters.  That is

because plaintiff repeatedly escalated the level of aggression between the two

parties.  For instance, when plaintiff turned around and asked defendant why she

kicked him, defendant escalated the exchange from a purely verbal interaction to a

physical one by elevating her leg and kicking out towards plaintiff.  (Tr. 96:1-6; see

also id. 72:8-73:7, 95:14-17, 96:9-12.)  Similarly, when defendant twice attempted to

retreat from the altercation and enter his office building, defendant positioned

herself to forcibly block his path.  (Compare id. 14:23-16:3 with id. 29:5-30:3, 101:20-

103:9.)  Thus, whether the altercation is viewed as one or several encounters, the

Court finds the evidence overwhelming that defendant served as the initial

aggressor.

2.   <u>Reasonable Belief of Attack</u>

A separate reason that defendant did not commit the above-described assaults and batteries in self-defense is that she could not have reasonably believed that she was under attack by plaintiff.  See <u>Sachs</u>, 2014 WL 1855615, at *2.

As a preliminary matter, the Court notes that defendant testified repeatedly and consistently that she felt personally attacked by plaintiff throughout the altercation.  (<u>Id.</u> 71:7:17 (right before kicking plaintiff), 91:23-92:8 (same), 92:23-93:9 (same), 93:20-94:5 (same), 72:8-25 (during verbal confrontation following kick), 98:1-9 (same), 99:7-13 (same), 73:4-20 (after plaintiff pushed defendant).)  However, to establish self-defense, an individual must prove not only that she actually believed she was under attack, but also that any such belief was objectively reasonable under the circumstances.  See <u>Sachs</u>, 2014 WL 1855615, at *2.

The Court will not make such a finding here.  As noted above, in the moments leading up to defendant's first kick, plaintiff had, at most, cut closely in front of defendant, causing her to trip.  (<u>See</u> PX 1 at 1-11"; Tr. 87:2-18.)  As plaintiff recognized, this sort of scuffle happens every day on the streets of New York City, especially during rush hour.  (Tr. 44:14-25 ("[T]he whole thing as to why I'm bringing this lawsuit is, you know, pretty much I'm walking to work, you know, just like everyone here, and all of a sudden someone doesn't like me walking in front of them.  And that's a common thing here in New York City.  It's not done intentionally.  It's not done to be malicious or anything."); <u>see also</u> <u>id.</u> 12:19-13:4 (noting, "[T]his is New York . . . . You know, people bump into you, step on your foot

18

all the time.")  This Court hesitates to imagine what the atmosphere in New York City would be like if cutting someone off on the sidewalk could create a reasonable belief of attack.  In addition, and critically, when defendant kicked plaintiff, plaintiff was walking <u>away</u> from her.  (<u>See</u> PX 1 at 12-13"; Tr. 14:17-15:5, 91:19-22.) Defendant lacked any reasonable basis to believe that plaintiff—an individual walking in front of her with no apparent reason to turn back around—was attacking or would soon attack her.

The Court notes that after the kick occurred, and the videotape footage ends, there are a few select moments that could—if viewed in isolation—create a reasonable belief that defendant sought to attack plaintiff.  For instance, plaintiff's statement, "Did you really just kick me?", might appear to prompt a reasonable belief that plaintiff intended to escalate the encounter.  (<u>See</u> Tr. 12:19-13:16.)  The same can be said of the portion of the encounter where plaintiff pushed defendant out of the way (<u>see</u> <u>id.</u> 15:15-16:18, 57:15-17; <u>see also</u> <u>id.</u> 73:8-20) or grabbed her by the collar to take her to the ground (<u>id.</u> 24:12-25:16; <u>see also</u> <u>id.</u> 27:14-24, 57:22-58:1, 73:8-75:13).  In all of these instances, it also might appear that defendant could have reasonably believed that plaintiff was attacking her as opposed to protecting himself.

However, upon closer examination, it becomes clear that any such argument ignores the full picture of the events, in which each of plaintiff's actions responded to one of defendant's.  For example, plaintiff's verbal confrontation followed defendant's initial kick (<u>see</u> PX 1 at 12-13"; Tr. 12:19-13:16), plaintiff's push

19

followed defendant's attempt to physically blocking plaintiff from entering his office building (see Tr. 15:15-16:3), and plaintiff's grabbing of defendant's collar followed defendant's "ballistic" behavior of hitting, kicking, punching and scratching plaintiff (see id. 24:12-25:16, 57:18-21).  Thus, under the totality of the circumstances, defendant could not have reasonably believed she was under attack by plaintiff.

        3.   Reasonable Use of Force

Another independent reason why defendant did not act in self-defense is that, at all relevant times, her use of force was not objectively reasonable under the circumstances.  See Sachs, 2014 WL 1855615, at *2; see also Biggs, 2010 WL 4628360, at *8 (noting that standard is objective).  This final element requires that the person claiming self-defense employ a level of force that does not reasonably exceed that of the alleged aggressor.  See Sachs, 2014 WL 1855615, at *2 (noting element would be satisfied where person acting in self-defense "used only the amount of force that a reasonable person would use to thwart [the aggressor's] attacks."); Biggs, 2010 WL 4628360, at *8 ("The use of self-defense is subject to the fundamental limitation that in protecting oneself no more force is permissible than will reasonably effect such protection.") (internal quotation marks and citation omitted).

The requisite proportionality clearly does not exist here.  Rather—as described above with respect to the prior two elements of self-defense—the Court concludes that defendant continually escalated the level of aggression between the parties, using more force than necessary to counter any force utilized by plaintiff.

B.    <u>False Arrest</u>

Under New York law, a private individual may be held liable for causing law enforcement to make a false arrest if the plaintiff establishes (1) the defendant intended to confine the plaintiff; (2) the plaintiff was aware of the confinement; (3) the plaintiff did not consent to the confinement; and (4) the confinement was not otherwise privileged by virtue of, inter alia, a warrant, probable cause and/or immunity protection.  King v. Crossland Sav. Bank, 111 F.3d 251, 255 (2d Cir. 1997) (citation omitted); Curley v. AMR Corp., 153 F.3d 5, 13 (2d Cir. 1998) (same).

To prove intent, a plaintiff must establish the defendant affirmatively procured or instigated the plaintiff's arrest.  Curley, 153 F.3d at 13; see also King, 111 F.3d at 255.  "Liability may attach only when the defendant has 'affirmatively induced the officer to act, such as [by] taking an active part in the arrest and procuring it to be made or showing active, officious and undue zeal to the point where the officer is not acting of his own volition.'"  Vlach v. Staiano, 604 F. App'x 77, 78 (2d Cir. 2015) (quoting Curley, 153 F. 3d at 13-14).  "[M]erely seeking police assistance or furnishing information to law enforcement authorities who are then free to exercise their own judgment as to whether an arrest should be made and criminal charges filed" cannot give rise to liability for false arrest, Moritz v. Town of Warwick, No. 15-cv-5424 (NSR), 2016 WL 3248494, at *3 (S.D.N.Y. June 9, 2016) (quoting Biswas v. City of N.Y., 973 F. Supp. 2d 504, 519 (S.D.N.Y. 2013)), even if the information later proves to be false, Druschke v. Banana Republic, Inc., 359 F. Supp. 2d 308, 312 (S.D.N.Y. 2005) (quoting King, 111 F.3d at 256-57); see also King,

111 F.3d at 256-57 ("When police independently act to arrest a suspect on information provided by a party, that party is not liable for false imprisonment—even if the information provided is later found to be erroneous.") (citation omitted). "'However, a complainant can be held liable for false arrest if the complainant intentionally provided false information to instigate an arrest by law-enforcement officials, or had no reasonable basis for the report.'" Moritz, 2016 WL 3248494, at *4 (quoting Biswas, 973 F. Supp. 2d at 519) (internal quotation marks omitted)).

Further, "[u]nder New York law, the existence of probable cause is an absolute defense to a false arrest claim." Jaegly v. Couch, 439 F.3d 149, 152 (2d Cir. 2006) (citing Weyant v. Okst, 101 F.3d 845, 852 (2d Cir. 1996)); see also Torres v. Jones, 47 N.E.3d 747, 760 (N.Y. 2016); Broughton v. State, 335 N.E.2d 310, 315 (N.Y. 1975). To establish probable cause, a plaintiff must prove that, at the time of the arrest and under the totality of the circumstances, a reasonable and prudent police officer would have thought that the defendant committed a crime. See Jaegly, 439 F.3d at 152 (citations omitted); Torres, 47 N.E.3d at 759 (citations omitted).

On the present record, it is undisputed that plaintiff was aware of and did not consent to being confined. It is the other two elements—intent and probable cause—that require greater analysis. In that regard, the Court finds it helpful (for purposes of assessing damages infra) to consider plaintiff's arrest as comprising two separate instances of "confinement" by the police: (1) the police's decision to handcuff him and place him in the patrol car; and (2) the police's subsequent

22

decision to take him to the precinct.  See King, 111 F.3d at 255 (noting

"confinement" as the actionable conduct under New York's false arrest standard);

Curley, 153 F.3d at 13 (same); see also Kerman v. City of N.Y., 374 F.3d 93, 125 (2d

Cir. 2004) (explaining that tort of false arrest "is complete with even a brief

restraint of the plaintiff's freedom" such that "it is not necessary that any damage

result from it other than the confinement itself.") (internal quotation marks and

citation omitted).  The Court analyzes each of these instances of confinement

separately.  Based on the record, it appears that the arresting officers held open the

possibility of releasing plaintiff from the patrol car until defendant indicated she

wanted to press charges.  Therefore, prior to that time, plaintiff is not liable for

false arrest and is not responsible for any damages allegedly incurred.  It is only

after plaintiff indicated she wanted to press charges that she became liable for false

arrest and any ensuing damages.

The Court turns first to plaintiff's initial confinement by the police—when,

following the altercation outside, police officers came up to his floor, placed him in

handcuffs (see Tr. 31:3-22; see also id. 60:11-13) and escorted him through the lobby

and into the patrol car (id. 34:70-18).  Defendant is not liable for false arrest arising

from this period of confinement because she did not affirmatively procure or

instigate his arrest at this point.  See Curley, 153 F.3d at 13; see also King, 111

F.3d at 255.  As a preliminary matter, neither defendant nor plaintiff called the

police; the police responded to the scene independently.  (Id. 59:25-60:2, 77:21-22,

106:11-13.)  Further, the record does not conclusively establish that the police went

23

up to defendant's office <u>after</u> speaking with defendant or the other present witnesses.  The most the Court can reconstruct of the timeline is that the police arrived a few seconds after plaintiff went into his office building (<u>id.</u> 77:13-20; <u>see also</u> <u>id.</u> 60:5-10 (noting that plaintiff did not witness individuals giving statements to the police when he entered his office building)), and that seven to nine officers reached plaintiff's floor about a minute after he did (<u>id.</u> 30:23-31:2).  While defendant did give a statement to the police, it seems unlikely that she provided the full account in the brief interval (around a minute) from when the police arrived to when the officers went upstairs to handcuff plaintiff.  (<u>See, e.g.</u>, <u>id.</u> 77:21-78:23 (noting that "the cops came over a few times" to speak with defendant).)  In the absence of any indication of what, if anything, defendant said to the police before they went up to plaintiff's floor, there is no basis upon which to hold defendant liable for falsely arresting plaintiff as he was handcuffed and escorted to the patrol car.

Defendant can be held liable, however, for falsely arresting plaintiff while the police detained him in the parked patrol car and transported him to and charged and booked him at the precinct.  The record reveals two ways in which defendant affirmatively procured or instigated this portion of plaintiff's confinement.  <u>See</u> <u>Curley</u>, 153 F.3d at 13; <u>see also</u> <u>King</u>, 111 F.3d at 255.  First, it appears to the Court that defendant "intentionally provided false information" to the police in

order to bring about his arrest.[14]  See Moritz, 2016 WL 3248494, at *4 (quoting

Biswas, 973 F. Supp. 2d at 519) (internal quotation marks omitted).  Defendant told

the police the same account to which she testified at trial, i.e., that the altercation

commenced when plaintiff purposefully cut her off on the street in order to trip her.

(Tr. 77:21-78:4, 113:24-114:2, 114:24-115:2.)  Defendant at no point told the police

that she was responsible for the encounter (id. 117:1-3), or that the encounter

resulted from a misunderstanding that spiraled out of control (id.117:4-8).  To the

contrary, she painted plaintiff as the sole and unmistaken aggressor, a

characterization fundamentally at odds with what actually occurred.  The intent

behind these statements was to cause the police to arrest plaintiff.

    Second, while plaintiff was waiting in the patrol car, defendant told the

police—in response to their question—that she wanted to press charges.  (Id. 118:8-

119:10.)  Had she said "no", it is at least likely that the police would have released

plaintiff, thereby avoiding plaintiff's transport in the precinct, time spent in a jail

cell and plaintiff's subsequent criminal prosecution.  Thus, by deciding to press

charges, defendant played an "active part in the arrest" alongside the police.  See

Vlach, 604 F. App'x at 78 (quoting Curley, 153 F.3d at 13-14).

    Defendant's liability for false arrest in the second portion of plaintiff's

confinement is not vitiated by probable cause.  The Court finds that defendant

failed to establish—as it is her burden to do—that the police reasonably thought

---

[14] Unlike during the first portion of the overall arrest, defendant's statement to the police is relevant here because she had finished talking to the police before plaintiff was placed in the patrol car and taken to the precinct.

that plaintiff committed a crime.  See Jaegly, 439 F.3d at 152 (citations omitted);

Torres, 47 N.E.3d at 759 (citations omitted).  Defendant proffered no testimony from

Officer Manetta, the arresting officer, or from other witnesses who spoke with the

police.  As a result, the sole proven bases for the arrest are the combination of

defendant's fallacious witness statement (see Tr. 77:21-78:3, 113:22-118:7), and

defendant's decision to press charges (see id. 118:8-119:10; see also id. 31:3-22

(providing that police handcuffed defendant before discussing the altercation with

him).)  While the police may have, in fact, had probable cause to arrest plaintiff,

defendant has not adduced sufficient evidence to prove that fact here.

    C.    <u>Damages</u>

        1.    <u>Compensatory and Nominal Damages</u>

Compensatory damages "compensate the injured victim for injuries actually

endured."  Virgilio v. City of N.Y., 407 F.3d 105, 116 (2d Cir. 2005) (citing State

Farm Mut. Auto Ins. Co. v. Campbell, 538 U.S. 408, 416 (2003)).  Both pecuniary

and nonpecuniary losses—such as emotional pain and suffering and loss of liberty—

are compensable under New York law.  See McDougald v. Garber, 536 N.E.2d 372,

373 (N.Y. 1989); see also Kerman, 374 F.3d at 125-26 (2d Cir. 2004) (discussing

damages recoverable for false arrest).  To recover compensatory damages, "[a]

claimant must present evidence that provides the finder of fact with a reasonable

basis upon which to calculate the amount of damages" incurred.  Makinen v. City of

N.Y., 167 F. Supp. 3d 472, 497-98 (S.D.N.Y. 2016) (quoting Mugavero v. Arms

Acres, Inc., 680 F. Supp. 2d 544, 581 (S.D.N.Y. 2010)) (internal quotation marks

omitted); see also Sir Speedy, Inc. v. L & P Graphics, Inc., 957 F.2d 1033, 1038 (2d Cir. 1992).  Damages for false arrest may be awarded "only for the period from initial custody until arraignment", as "[s]ubsequent damages resulting from continued incarceration are attributable only to the tort of malicious prosecution." Hygh v. Jacobs, 961 F.2d 359, 366 (2d Cir. 1992) (quoting Dabbs v. New York, 451 N.E.2d 186, 188 (1983)) (internal quotation marks omitted); see also Palmquist v. City of Albany, 492 N.Y.S.2d 487, 488 (3d Dep't 1985) (declining to award legal fees for criminal defense where there was "insufficient proof in the record to establish that plaintiff's legal fees were limited to the defense of the arrest itself and not the criminal action.").

   As discussed above, assault, battery and false arrest do not require proof of actual damages.  See Brutus v. Silverseal Corp., 439 F. App'x 28, 29 (2d Cir. 2011) (noting that although evidence of injury is not necessary to establish liability for assault or battery, "such evidence is required if [the plaintiff] is to sustain a claim for compensatory damages caused by the assault and battery.") (citations omitted); Kerman, 374 F.3d at 125 (explaining that tort of false arrest "is complete with even a brief restraint of the plaintiff's freedom" such that "it is not necessary that any damage result from it other than the confinement itself.") (internal quotation marks and citation omitted).  If a plaintiff establishes an assault, battery or false arrest but does not adduce any evidence of actual loss, the fact finder must award nominal damages.  Contemporary Mission, Inc. v. Famous Music Corp., 557 F.2d 918, 926

(2d Cir. 1977) ("When the existence of damage is uncertain or speculative, the plaintiff is limited to the recovery of nominal damages.").

Here, the Court awards nominal damages to plaintiff in the amount of $1.00 on defendant's assault and battery claim.  Plaintiff suffered no compensable pecuniary losses as a result of the assaults and batteries.  Following the altercation, plaintiff endured no physical injuries beyond some scratches on his face (id. 30:7-12, 62:11-13 see also id. 57:7-8) and incurred no medical expenses (see id. 62:5-10).  While plaintiff did incur legal and investigative fees in connection with his criminal prosecution, those out-of-pocket damages are not proximately linked to the subject assaults and batteries, and hence are not recoverable as compensation for these torts.  Under these circumstances, $1.00 in nominal damages is appropriate.  See, e.g., Brutus v. Silverseal Corp., No. 06-cv-15298 (LAP), 2010 WL 8941831, at *2 (S.D.N.Y. Aug. 31, 2010) (concluding, under New York law, that "[b]ecause Plaintiff proved liability but not actual damages, a reasonable jury could not have awarded more than nominal damages") (citations omitted); Brooker v. State, 614 N.Y.S.2d 640, 641 (3d Dep't 1994) (upholding award of $1.00 in nominal damages for assault and battery claim where plaintiff established no compensable injuries or losses).

As for false arrest, the Court awards compensatory damages in the amount of $5,000.  This award compensates plaintiff for non-pecuniary losses incurred during the portion of the arrest for which defendant is liable—i.e., the period during which

plaintiff was in the patrol car, held in a cell and booked at the precinct.[15]   Plaintiff suffered several distinct harms during this period:  the embarrassment and humiliation of being held in a patrol car for 45 minutes as passers-by gawked and took photographs (Tr. 34:16-35:3); the uncomfortable experience of spending forty minutes in a jail cell (and an hour at a precinct) (id. 35:13-37:4); and plaintiff's overall loss of liberty during these two hours (id. 41:23-42:3).  These damages are recoverable under the tort of false arrest.  See Kerman, 374 F.3d at 125-26 (explaining that non-pecuniary damages for loss of liberty, embarrassment and emotional suffering are recoverable under tort of false arrest).  Although New York courts "vary widely in the amount of damages awarded for mental anguish", Stampf v. Long Island R. Co., 761 F.3d 192, 207 (2d Cir. 2014) (citation omitted), they regularly "uphold awards of up to $10,000 for even short periods of confinement without proof of actual damages", Kerman, 374 F.3d at 125 (alteration and citation omitted) (collecting cases awarding $7,500-$10,000 for 3-5 hours of improper confinement).  Thus, since "an award of several thousand dollars may be appropriate simply for several hours' loss of liberty", Kerman, 374 F.3d at 125-26 (citations omitted), the Court concludes that a reasonable amount of compensatory damages for plaintiff's confinement in the patrol car and police precinct is $5,000.

---

[15] Since, as described above, defendant is not liable for false arrest relating to the initial portion of plaintiff's confinement—when police handcuffed defendant and ushered him through the lobby to the patrol car—any emotional distress plaintiff felt during this period is not compensable.  That is, despite plaintiff's credible testimony as to his humiliation throughout the overall arrest, the Court does not award any damages to address the fact that plaintiff was handcuffed in front of his colleague (see id. 31:23-32:7) or was escorted through a lobby full of people (some of whom were his clients) while in handcuffs (see id. 34:7-15, 79:2-9).

2.    <u>Punitive Damages</u>

"The purpose of punitive damages is to punish the defendant for his willful or malicious conduct and to deter others from similar behavior." <u>Memphis Cmty. Sch. Dist. v. Stachura</u>, 477 U.S. 299, 306 n.9 (1986); <u>see also</u> <u>Loughry v. Lincoln First Bank, N.A.</u>, 494 N.E.2d 70, 74 (N.Y. 1986) (explaining that punitive damages "serve the societal purposes of punishing and deterring the wrongdoer, as well as others, from similar conduct in the future.") (citation omitted).  Under New York law, "the standard for imposing punitive damages is a strict one and punitive damages will be awarded only in exceptional cases", <u>Marinaccio v. Town of Clarence</u>, 986 N.E.2d 903, 906 (N.Y. 2013), such as those "involving 'gross, wanton, or willful fraud or other morally culpable conduct'", <u>Action S.A. v. Marc Rich & Co.</u>, 951 F.2d 504, 509 (2d Cir. 1991) (quoting <u>Borkowski v. Borkowski</u>, 355 N.E.2d 287, 287 (N.Y. 1976)); <u>see also</u> <u>Marinaccio</u>, 986 N.E.2d at 906 (noting that "the conduct justifying [a punitive damages] award must manifest 'spite or malice, or a fraudulent or evil motive on the part of the defendant, or such a conscious and deliberate disregard of the interests of others that the conduct may be called willful or wanton'") (quoting <u>Dupree v. Giugliano</u>, 982 N.E.2d 74, 76 (N.Y. 2012)); <u>Ross v. Louise Wise Servs., Inc.</u>, 868 N.E.2d 189, 196 (N.Y. 2007) ("Punitive damages are permitted when the defendant's wrongdoing is not simply intentional but 'evince[s] a high degree of moral turpitude and demonstrate[s] such a wanton dishonesty as to imply a criminal indifference to civil obligations'") (quoting <u>Walker v. Sheldon</u>, 179 N.E.2d 497, 499 (N.Y. 1961)).

Although the factfinder has discretion to determine whether to award punitive damages and, if so, in what amount, Nardelli v. Stamberg, 377 N.E.2d 975, 977 (N.Y. 1978), punitive damages must "bear some reasonable relation to the harm done and the flagrancy of the conduct causing it". Bi-Econ. Mkt., Inc. v. Harleysville Ins. Co. of N.Y., 886 N.E.2d 127, 131 (N.Y. 2008) (citation omitted). In arriving at the appropriate amount, the factfinder may consider the defendant's financial circumstances. Brink's Inc v. City of N.Y., 717 F.2d 700, 706-07 (2d Cir. 1983) ("Under New York law, evidence of a defendant's wealth is admissible on the issue of the amount of punitive damages.") (citations omitted); see also Softel, Inc. v. Dragon Med. & Sci. Commc'ns Ltd., 891 F. Supp. 935, 945 (S.D.N.Y. 1995); Greenbaum v. Handelsbanken, 67 F. Supp. 2d 228, 267-68 (S.D.N.Y. 1999).

Here, the Court finds that defendant's conduct reflects the sort of willful disregard of the interests of others that justifies imposing punitive damages, see, e.g., Marinaccio, 986 N.E.2d at 906, both as a general and specific deterrent, see Memphis Cmty. Sch. Dist., 477 U.S. at 306 n.9. A $10,000 award is appropriate here. In arriving at this amount, the Court considers the financial circumstances of defendant, as it is entitled to do. See Brink's Inc., 717 F.2d at 706-07; Softel, Inc., 891 F. Supp. at 945; Greenbaum, 67 F. Supp. 2d at 267-68. At trial, the Court specifically questioned defendant regarding her financial circumstances for the stated purpose of identifying an appropriate amount of punitive damages to impose, if any. (See Tr. 80:10-84:25.) The Court repeatedly invited defendant to bring any information she thought might be relevant to the Court's attention. (Id. 83:20-

31

84:25.)  During the course of that exchange, defendant testified regarding her and her husband's salaries, as well as their family planning, and primary assets and debts, as described below.

Defendant testified that she works on a freelance basis in the fashion industry (id. 80:10-19) and that she earns less than $1,000 a year (id. 81:5-22). She also testified that her husband works in the music industry.  (Id. 80:22-25.) While she first stated (with not much credibility) that she was not sure what he earned, she then testified that he earns around $65,000 a year.  (Id. 82:19-83:6.) The couple is expecting their first child in February 2017.  (Id. 83:20-84:9.)  The couple's primary assets are their home and two cars.  (Id. 83:17-19.)  The home— which the couple owns, and on which there is a mortgage—is located at 5300 Woodlands Terrace in Nashville.  (Id. 81:23-82:18.)  The couple's two cars are a 2000 Rav4 and a 2014 or 2015 Mazda.  (Id. 83:7-16.)  The couple's only other significant debts are student loan payments made by defendant's husband.  (Id. 84:13-22.) Defendant testified that she could not value these assets and debts because her husband handles the household's finances.  (See id. 81:23-84:25.)

Defendant testified that aside from the factors stated above, she knew of no circumstances that would bear on her ability to pay punitive damages.  (Id. 83:20-84:25.)  Taking into consideration these factors, and considering the nature of defendant's conduct, the Court finds $10,000 to be an appropriate punitive damages award.

D.   <u>Attorneys' Fees</u>

Since the decision to award of attorneys' fees is a matter of substantive state law, the law of the forum state—here, New York—controls the analysis in diversity cases.  <u>RLS Assocs., LLC v. United Bank of Kuwait PLC</u>, 464 F. Supp. 2d 206, 213 (S.D.N.Y. 2006) (discussing <u>Erie R.R. Co. v. Tompkins</u>, 304 U.S. 64 (1938) doctrine and collecting cases).  Under New York law, the general rule is that attorneys' fees "may not be awarded to the prevailing party unless authorized by agreement between the parties, statute, or court rule." <u>U.S. Fid. & Guar. Co. v. Braspetro Oil Servs. Co.</u>, 369 F.3d 34, 74 (2d Cir. 2004) (quoting <u>Oscar Gruss & Son v. Hollander</u>, 337 F.3d 186, 199 (2d Cir. 2003)); <u>see also</u> <u>Goldberg v. Mallinckrodt, Inc.</u>, 792 F.2d 305, 309 (2d Cir. 1986); <u>Engel v. CBS, Inc.</u>, 711 N.E.2d 626, 629 (N.Y. 1999).  In the absence of any exception to the general rule, the Court declines to award plaintiff attorneys' fees here.

IV.    CONCLUSION

For the reasons set forth above, the Court finds that defendant assaulted, battered and falsely arrested plaintiff and hereby awards plaintiff $1.00 in nominal damages, $5,000 in compensatory damages and $10,000 in punitive damages.

Plaintiff shall submit a proposed judgment within **one week of the date hereof.**

The Clerk of Court is directed to terminate this action.


SO ORDERED.

Dated:      New York, New York
            January 20, 2017


                                    _____
                                    KATHERINE B. FORREST
                                    United States District Judge


Copy To:

Jacqueline Musanti
jmitnasum@gmail.com